1                    IN  THE  UNITED  STATES  DISTRICT  COURT

2                      FOR  THE  DISTRICT  OF  RHODE  ISLAND

3

4
       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *    C.R. NO. 18-141-JJM
5                                          *
   UNITED STATES OF AMERICA      *
6                                          *
       VS.                       *    MARCH 22, 2019
7                                *    10:00 A.M.
   THOMAS GOODMAN                *
8                                          *
       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *    PROVIDENCE, RI
9

10          BEFORE THE HONORABLE JOHN J. McCONNELL, JR.,

11                         DISTRICT JUDGE

12
                         (Sentencing Hearing)
13

14   APPEARANCES:

15   FOR THE GOVERNMENT:   LEE VILKER, AUSA
                           U.S. Attorney's Office
16                         50 Kennedy Plaza
                           Providence, RI  02903
17
     FOR THE DEFENDANT:    MATTHEW S. DAWSON, ESQ.
18                         Lynch & Pine
                           One Park Row, 5th Floor
19                         Providence, RI  02903

20   Court Reporter:       Karen M. Wischnowsky, RPR-RMR-CRR
                           One Exchange Terrace
21                         Providence, RI  02903

22

23

24

25

```
1    22 MARCH 2019 -- 10:00 A.M.
2         THE COURT:  Good morning, everyone.  We're here
3    this morning for sentencing in the case of the United
4    States versus Thomas Goodman, Criminal Action 18-141.
5         Would counsel identify themselves for the
6    record.
7         MR. VILKER:  Lee Vilker, Assistant U.S.
8    Attorney, for the Government, your Honor.
9         THE COURT:  Good morning, Mr. Vilker.
10        MR. VILKER:  Good morning.
11        MR. DAWSON:  Matthew Dawson for Mr. Goodman.
12   Good morning, your Honor.
13        THE COURT:  Good morning, Mr. Dawson.
14        Good morning, Mr. Goodman.
15        THE DEFENDANT:  Good morning.
16        THE COURT:  Mr. Goodman, the Probation
17   Department issued a presentence report in your case.
18   Did you receive a copy of that?
19        THE DEFENDANT:  Yes.
20        THE COURT:  And did you have a chance to review
21   that with your lawyer?
22        THE DEFENDANT:  Yes.
23        THE COURT:  And did he answer any questions that
24   you have about that?
25        THE DEFENDANT:  Yes.
```

1          THE COURT:  How we're going to proceed this

2     morning is, it will take a while, but we've got to

3     calculate the advisory guideline ranges which are

4     contained in the presentence report.

5          We'll go through that.  I'll see if there's any

6     objections by either side to the presentence report or

7     the guidelines.  If there are, I'll hear that.  If not,

8     the Government will then make its sentencing

9     recommendation.

10          I understand from my clerk that there's a victim

11     statement that can come at any time, Mr. Vilker, that

12     you wish.

13          Your lawyer will then be able to make his

14     sentencing recommendation.  Then you'll be allowed to

15     speak if you wish to, and then I'll get on with the

16     sentence.  Okay?

17          THE DEFENDANT:  Yes.

18          THE COURT:  So the guidelines set forth in the

19     presentence report are probably the most complicated

20     that I've ever seen; and they speak for themselves, I

21     should say from the beginning, if I get their

22     explanations wrong; but Counts I through IV of sexual

23     exploitation of a minor are similar.

24          Each of those counts carry a base offense level

25     of 32.  Each of those counts have certain specific and

1   the same specific offense characteristics.  One is

2   because the offense involved a minor who had not yet

3   obtained the age of 12, four points are added.  Two

4   points are added because the offense involved the

5   commission of a sexual act or sexual contact.  Two

6   points are added because the Defendant knowingly

7   engaged in the distribution of those images.  Two

8   points are added because the Defendant is a parent of

9   minor -- one of the minor victims in each of the first

10  four counts.  So the adjusted offense level for each of

11  the Counts I, II, III and IV is 42.

12          Count V and VI also have the same calculations,

13  each separately, but slightly different.  The base

14  offense level for Counts V and VI are at 32.  The

15  four-point addition, because Minor Victim 3 was three

16  weeks old to one year of age at the time of the

17  offense, four points are added.  Two points are added

18  because the Defendant admitted committing these acts

19  upon Minor Victim 3 as set forth in the paragraph.  Two

20  points are added because the Defendant knowingly

21  engaged in distribution.  Four points are added because

22  the offense involves sadistic or masochistic conduct or

23  other depictions of violence as to one of the minor

24  victims set forth in Counts V and VI, and two points

25  are added because the Defendant is the father of one of

1    the minor victims.  So Counts V and VI carry an

2    adjusted offense level of 46.

3         Similarly, Counts VII and VIII can be grouped

4    together under the guidelines, carries with it a base

5    offense level of 32.  Four points are added because of

6    the minor victim's age at the time, two points are

7    added because of the knowing distribution, and two

8    points are added because one of the minor victims was

9    under the supervisory control of the Defendant for an

10   adjusted offense level of Counts VII and VIII of 40.

11        Count IX, which is the possession of child

12   pornography, starts with a base offense level of 18.

13   Two points are added because minor children were

14   involved.  Two points were added because distribution

15   was involved.  Four points are added because the

16   material involves sadistic or masochistic conduct.

17   Five points are added because of the sexual abuse or

18   exploitation of a minor that was involved.  Two points

19   are added because of the use of a computer.  Five

20   points are added because there were more than 600

21   images for an adjusted offense level of 38.  That's the

22   nine counts.

23        When you do the multiple-count adjustment,

24   Counts I through VI equal one unit under the

25   guidelines, Counts VII and IX each equal a half a unit,

1    and so the total number of units involved in these nine

2    counts is seven and a half.

3          The greater offense level of all the counts is a

4    46.  That is increased by five points because of the

5    number of units involved for a combined offense level

6    of 51.

7          There is an enhancement of five points because

8    the activity involved prohibited sexual conduct and

9    meeting the category of the guidelines that represents

10   repeat and dangerous sex offender -- as a dangerous and

11   repeat sex offender against minors for a total of 56.

12         Two points are deducted for acceptance of

13   responsibility.  And, Mr. Vilker, the Government wishes

14   to make a motion on the third point?

15         MR. VILKER:  Yes, your Honor.

16         THE COURT:  Which will be granted, and all of

17   that takes us to the point that we are well above by

18   about 10 the top guideline level anyway.  So the total

19   offense level is a 43, and that's because there's no

20   higher level.  So instead of a 53, it will be a 43.

21         Mr. Goodman has no criminal history, therefore,

22   no points, and is a Criminal History Category I.

23         So a total offense level of 43, criminal history

24   category of I, along with a -- many other machinations

25   that the guidelines require and the statute requires

1    comes with a recommended period of incarceration of

2    3,120 months, which is 260 years, with a caveat that

3    each of the first eight counts carry with it a 15-year

4    mandatory minimum.

5         Mr. Vilker, any objection to the calculation of

6    the guidelines or to the presentence report?

7         MR. VILKER:  No, your Honor.

8         THE COURT:  Mr. Dawson?

9         MR. DAWSON:  No, your Honor.

10        THE COURT:  Great.  Mr. Vilker, I'll hear from

11   the Government.

12        MR. VILKER:  Your Honor, I think before the

13   Government makes its sentencing argument, we would call

14   up the victim here, the parent of one of the victims.

15        THE COURT:  Sure.  Ma'am, there's no reason for

16   you to reveal your name, but if you would come forward

17   and just be sure to speak into the microphone.  Thank

18   you.

19        SPEAKER:  Good morning, your Honor.  I was asked

20   to write a statement in regards to the crimes committed

21   by the Defendant and how these crimes have affected

22   myself, my family and my three children.

23        May 17th was just like any other day being home

24   with the children.  Little did I know that it would be

25   the day when my entire world would shatter into a

1  million pieces.  It would be the day when my children's

2  entire world as they knew it would change, but they

3  would be too young to understand how or why.

4       I was telling my kids that daddy would be home

5  soon not knowing that they would, in fact, never be

6  seeing their father again.

7       This has been the biggest emotional roller

8  coaster I have ever been on in my entire life.  I had

9  to watch what seems like dozens of police officers tear

10  apart my home and look through my personal belongings

11  searching for any evidence in regards to the crimes

12  committed.

13       I was asked to look at sensitized photos of

14  child pornography to try and identify any potential

15  victims, and doing so made me sick to my stomach.  I

16  didn't want to, but I knew that it had to be done to

17  help anyone who may have been victimized by the

18  Defendant.

19       I would never in a million years want to see a

20  child being exploited and abused in such a manner; but

21  because of the Defendant's actions, I had to be close

22  and personal with the process.

23       I cried myself to sleep every day for a month,

24  and every day was for a different reason.  Sometimes I

25  cried over the loss of who I thought I had married.  I

1      word it this way because I never missed the person who

2      stands in this courtroom today.  This is not the man I

3      exchanged wedding vows with or the man that I would

4      ever choose to be the father of my children.

5            The person I married never existed.  He was

6      someone that the Defendant made up and personified.

7      This is the person I cried for.  It felt like the

8      person had died, but I could not truly mourn like you

9      would a death.

10           I will never forget having to go through all the

11     Defendant's personal belongings and packing them up so

12     I wouldn't have to look at them and be reminded of the

13     partner I no longer had.  Removing every memory of this

14     person from my home was as therapeutic as it was

15     heartbreaking.

16           The process made me realize that this was, in

17     fact, my new reality and not some awful nightmare that

18     I was going to wake up from.  My entire world was

19     falling apart around me.

20           There were many mornings where I didn't want to

21     even get out of bed and face the reality.  The only

22     reason why I got up every day and did what had to be

23     done is because of the children that were counting on

24     me to care for them and meet their needs with a smile

25     on my face when all I wanted to do was cry over what

1    was lost.

2         Eating and sleeping became difficult because of

3    all the pain, anger, depression and stress that seemed

4    to come in waves for months all the while trying to

5    hide all these feelings from my small children and my

6    family.

7         I felt like I had to be strong when in reality I

8    never felt weaker and more defeated.  It was a struggle

9    trying to create a sense of normalcy for my children

10   when everything around them was, in fact, not normal.

11        Bottling up all this stress, anger and hurt felt

12   like it physically hurt sometimes.  I would often cry

13   out of pure anger.  I was furious because someone so

14   close to me has hurt and abused my children behind my

15   back, and he was the one person I was supposed to be

16   able to trust with everything.

17        When I trust someone with my children, I am

18   trusting them with the most precious things in my

19   entire world, and it kills me that my trust was so

20   misplaced.  I feel like my children and I have been

21   betrayed in the ugliest and most awful ways possible.

22        The stress of having enough money and raising my

23   children on my own seems like more than I could bear at

24   times.  I had to work very hard to stretch our money so

25   that my kids could have food, a roof over their heads

1    and clothes on their backs.

2           I was a stay-at-home mother who had just given

3    birth and was not in a position to find work.  I found

4    myself having many financial issues because of the

5    Defendant's actions.

6           I am responsible for all the marital debt, and

7    that is a burden I must now bear on my own.  There were

8    many bills that I could not cancel because they were in

9    the Defendant's name, and so I had to spend a lot of

10   money I did not have.

11          I had to make many phone calls explaining that I

12   did not have the money to pay the bill that was sent to

13   me, and that hurt my pride quite a bit.

14          I had to sell my home because I could not afford

15   to live there by myself and it was too far away from my

16   family to come help me every week.  I had to accept

17   significantly less than what it was worth so that I

18   could move away as quickly as possible for financial

19   reasons.

20          I had to say goodbye to the house where my

21   children were born and where I raised them since

22   infancy.  There are still days months later where the

23   kids and I miss our old home very much.  However, we

24   must accept the fact that that chapter in our life has

25   come to a close.

1    The Defendant's actions has forced me to make

2  some very difficult decisions in an attempt to clean up

3  the mess that was left after his crimes; and,

4  unfortunately, I did not have a lot of choices at my

5  disposal.

6    I had to make some very hard decisions for not

7  only myself but the children who depend on me for

8  everything.  There was no way that everyone was going

9  to be happy, and there was no way that I could make

10  things perfect.

11    I had to figure out the lesser of all the evils

12  and just hope that I was doing the right things for

13  everyone who has been affected by everything that had

14  transpired.

15    Still to this day I hope that I'm doing the

16  right things as the only parent these children have;

17  but all I can really do is my best, love them with all

18  my heart and surround them with people who love them as

19  well.

20    I had to cope with the stress of DCYF coming

21  into my home to make sure my children were living in a

22  safe environment all because of the Defendant's actions

23  and crimes.

24    THE COURT:  Ma'am, do you mind just slowing down

25  a little bit.  I apologize.

1       SPEAKER:  I'm sorry.

2       THE COURT:  You have no reason to apologize.

3   The court reporter just has a difficult time keeping up

4   with it.  We all read fast, but if you can just slow

5   down a little bit.

6       SPEAKER:  Yeah.

7       THE COURT:  Okay.  Thanks.

8       SPEAKER:  There was so much fear and uncertainty

9   about what to expect and what was going to happen at

10  that time in my life.

11      I also made the decision to start going

12  through -- going to counselling to help myself with

13  some of the issues I had been dealing with since the

14  Defendant's arrest, and I think I will probably be

15  going for quite some time.

16      I have had to learn to trust people again, and I

17  have had to learn that not everyone is going to lie to

18  me.  It has been very difficult accepting the fact that

19  not everyone is out to hurt me or my children.

20      I have found myself pushing people away out of

21  fear in an attempt to protect myself and, above all, my

22  children.  My thought process at the time was if I

23  can't trust my own husband, then who on this earth can

24  I trust?  This is a very difficult lesson that I have

25  had to learn and will continue to learn as my journey

1    with my therapist progresses.

2          The way this has affected the children is

3    probably the most profound because not only were they

4    personally victimized, but they are not old enough to

5    understand what is happening around them.

6          You don't really know what they're feeling

7    because they can only convey things in a very

8    simplistic manner or just simply act out.

9          Losing their father was difficult and confusing

10   for them.  I've had to hold my son while he cried

11   because he didn't understand where daddy was.

12         I had to try to help them adjust to a new living

13   situation and a new routine that no longer included the

14   father that had been in their lives since day one.  I

15   had to explain almost every day for a month that their

16   father could not read to them, play with them and that

17   he wouldn't be coming home.  They had to leave the only

18   home they had ever known because I had no choice but to

19   do so.

20         It wasn't always easy having to share my

21   attention when I was the only parent in the house,

22   especially considering the fact that there was a new

23   baby that they were getting used to.

24         I had to put the children in play therapy so

25   that someone could help them cope with the many

emotions that they were going through.  I also wanted

someone to help the children cope with any abuse that

they may have suffered at the hands of the person who

was supposed to protect them with his life.

My son and daughter suffered with separation

anxiety after losing their father, and it made leaving

them with trusted family members very difficult for me

if I had to go somewhere without them.  They had to

deal with a lot of changes in a very short period of

time, and it has not been an easy process.

I've spent this last year wondering what my son

has been exposed to and what he has witnessed and how

it will affect him as he grows.

I've also had to wonder what the Defendant has

put my daughter through because, frankly, I don't trust

him to tell the whole truth.

I have to work extra hard to teach them healthy

boundaries since their father has done nothing but

cross every boundary that should never be crossed by

anyone.

My children have to grow up without a positive

healthy father figure because of what the Defendant has

done and because of what he is, and that could not be

more unfair to them.

It breaks my heart that I have to explain to my

1   children that they can't see their father because he

2   hurt some people and he is not safe to be around.  They

3   don't quite understand what that means, but they have

4   asked on multiple occasions where he is and why they

5   can't see him.

6        They sometimes ask why he hurt people, and I

7   honestly don't know what to say because I don't know

8   how anyone can do what he has done.  I felt like I owed

9   them an answer because I've always based my parenting

10  on being honest in an age-appropriate manner.

11       In conclusion, your Honor, I would love to see

12  the Defendant get the maximum penalty for the crimes

13  that he has committed.  I know that that is not my

14  decision to make, but I know that writing this

15  statement is my chance to be heard as well as conveying

16  what I want to see happen as this process comes to a

17  close.

18       I think the crimes that were committed are

19  unforgivable, and I hope to see that there is no

20  leniency in the sentencing.

21       I'd like to thank you, your Honor, for giving me

22  the chance to speak in your courtroom today and for

23  allowing my voice to be heard.

24       THE COURT:  Thank you, ma'am.  I appreciate it.

25       Mr. Vilker.

1          MR. VILKER:  Thank you, your Honor.  I don't

2     even know where to begin with this case.  I've been a

3     prosecutor now for like 20 years, and this is by far

4     the worst case that I've ever handled in terms of the

5     Defendant's conduct.

6          Your Honor's read the prosecution version.  What

7     this Defendant did to his own daughter, the daughter of

8     a close family friend for a period of years and years

9     when they were just little girls is unfathomable.

10         The harm that he's caused them they're never

11    going to get past.  They just never will.  I know both

12    of them are struggling, and I'm talking about the girls

13    who are now 16.  They're struggling in life.  They're

14    doing the best they can, but this isn't anything you

15    can ever really get past.

16         I don't know how they're going to be successful

17    when having an adult relationship with an adult male at

18    some point in their lives.  He's scarred them

19    permanently.  He abused them for years as they were

20    just little children.  It's -- you can't even find an

21    adjective, despicable, horrific, grotesque.  I don't

22    even know how you can describe it.

23         When he was arrested last May, he still had in

24    his phone and on his computer the videos and images of

25    his sexual molestation of his daughter and the daughter

1  of a family friend that had occurred up until -- from

2  2007 to 2013.  So he still had these images.  He's

3  still keeping them in his possession some five years

4  later.

5         It's very clear that but for the fortuitous

6  circumstances that led to his arrest, which really were

7  a miracle that it happened, his two youngest daughters,

8  the one who is now I believe about three years old and

9  one who's I believe a year, would have been raped and

10  molested their entire childhood.

11         He had already begun the process with his

12  second-to-youngest daughter who from the time she was

13  three weeks old until the time she was a year and a

14  half, the Defendant was taking very graphic pictures of

15  her, touching her inappropriately, putting things

16  inside of her inappropriately.  This is a little baby,

17  and many images and videos were found of this little

18  baby at the time.  It's horrific.

19         The Defendant also -- it's almost like you can't

20  even talk about these other parts of the case because

21  they, as horrific as they are, they kind of pale in

22  comparison to what the Defendant did with the actual

23  contact offenses.

24         But there was another girl that the Defendant --

25  who was 11 years old that the Defendant put a hidden

1    camera in the bathroom to take video of her going into

2    the shower.

3         He possessed thousands of images and videos of

4    child pornography, and coming in now are a lot of the

5    victim impact statements from those victims who were

6    also raped and the Defendant got pleasure from their

7    enjoyment (sic).

8         This is a profoundly dangerous and disturbing

9    individual, and the need to punish this Defendant and

10   to protect the public in this case is paramount.

11        He needs to be punished for what he has done to

12   his victims.  Their lives are forever going to be

13   scarred and damaged, and they're going to be struggling

14   with this for the rest of their lives, the two older

15   girls, what he did to them; and he needs a very, very

16   long sentence to punish him.

17        But even beyond that, your Honor, the public

18   needs to be protected from this Defendant.  This

19   Defendant, as I mentioned before, to this date, to the

20   date of his arrest was continuing this behavior with a

21   little girl, a baby.  It's very clear that she and now

22   her younger sister, who was born after her, would have

23   been molested for years to come.

24        This is a man who's obviously sexually attracted

25   to little girls and obviously acts on those impulses

1    and has done so for years and years.  Nothing is going

2    to stop this Defendant from molesting little girls.

3          And really the only question before your Honor

4    today, and I know the defense has asked for 22 years'

5    imprisonment, the Government has asked for 100 years,

6    and the reason why we picked that number is just to

7    come up with any number that would ensure that this

8    Defendant would never be released.  There's nothing

9    magical about the number 100.

10         We don't want a situation where this Defendant,

11   if he were to be given what the defense has asked for,

12   22 years, he could be released in good time in 18 years

13   and perhaps under the recent law get additional credit

14   for programs he's taking inside the Bureau of Prisons

15   and be released in his early 60s.

16         He could still do a lot of harm at that point.

17   At that point he may have granddaughters or other

18   little girls he has access to.  This Defendant should

19   never be allowed to step outside of prison walls.  Any

20   moment that he's outside is a danger to young girls.

21         I know in other cases this Court has handed down

22   very harsh sentences in cases that I would argue,

23   although obviously also horrific, were less -- slightly

24   less horrific than this case.

25         I know in the Crisostomi case your Honor gave

Case 1:18-cr-00141-JJM-LDA   Document 37   Filed 04/10/19   Page 21 of 36 PageID #: 241

21

1   that Defendant 35 years.  In that case the Defendant

2   made videos of him receiving oral sex from his

3   seven-year-old daughter.  Obviously horrific but less

4   horrific, if you're going to put these in some kind of

5   spectrum, than this Defendant who was having oral and

6   vaginal relations with his own daughter and the

7   daughter of a family friend for a period of many, many

8   years.

9            Mr. Crisostomi got 35 years, and this Defendant

10  should get more.  This Defendant should get enough so

11  that the public can feel confident that he's never

12  going to harm another child again.  Thank you, your

13  Honor.

14           THE COURT:  Thanks, Mr. Vilker.

15           Mr. Dawson.

16           MR. DAWSON:  May it please the Court.  Your

17  Honor, on behalf of Mr. Goodman and myself, really, I

18  want to acknowledge the difficulty of this case.  This

19  is a very difficult case, and I want to acknowledge the

20  toll that it takes on everybody involved from the

21  prosecution to the analysts that have to go through

22  this, agreed, horrific evidence.  From my own

23  investigation, I know they were troubled by that.

24  Certainly Mr. Goodman's family and, most importantly,

25  the victims in this case.

1          Mr. Goodman, upon his arrest, I think did the

2     only thing he could do for those victims and these

3     people, is admit his guilt.  I think it's very

4     important to note that in this case, and I'll get in a

5     moment to comparisons to other cases, but Mr. Goodman

6     from the moment he was arrested volunteered a

7     confession, a lengthy confession where he disclosed

8     details that the Government could have never known but

9     for his admissions.

10         The moment I met him, I was appointed on the

11    first day of his appearance, I met him in the cellblock

12    area, and he immediately informed me that he did not

13    want to contest these matters.  He did not want to put

14    his daughter or any of the victims through the process,

15    the traumatic process of having to testify at any level

16    on this.

17         There was no grand jury.  There certainly was no

18    trial.  I know the Court has experience in those

19    matters as well as the prosecution and myself.  I've

20    dealt with cases like this hundreds of times on both

21    sides, and I really don't want to undersell or

22    oversell; but the traumatic and heartbreaking

23    experience that a person would have, a young girl would

24    have having to testify is incalculable.  It's in many

25    respects a revictimization.

1          And I'm certainly not standing here attempting

2     to excuse Mr. Goodman's behavior in this matter.  He's

3     pled guilty to a host of very serious crimes, but I do

4     respectfully request that this Court acknowledge that

5     he's done all he could to try to minimize the damage on

6     the victims in this case, and that was his priority.

7          The Court, in addition to having a toll on

8     probably all of us, I respectfully suggest it's

9     difficult for you now to sit here and determine what is

10    sufficient but not greater than necessary in keeping

11    with the mandate of the statute but, in addition,

12    dealing with guidelines that are just almost

13    unbelievable.

14         When you count them out loud, I read it, but

15    when you count them out loud like that, it's difficult

16    to even fathom how many upticks and different enhancers

17    are present here.

18         I understand that.  I understand all those

19    upticks.  I understand why they do that.  I understand

20    the guidelines.  I understand the Government's

21    recommendation.  I understand the victim's mother who

22    testified, who just spoke to you.  I understand why she

23    wants him to receive the maximum.

24         But that's -- I understand, and I understand --

25    and I'm not even going to say that's the easy way to do

1    things because in many ways a lot of those calculations

2    are appropriate, but Mr. Goodman comes before the Court

3    in a much different posture than many of the other

4    Defendants that are referred to by the Government.

5         I generally don't make those comparison

6    arguments.  I just don't make those comparison

7    arguments.  I don't generally make them.  I don't do

8    that.

9         As a young prosecutor, I was told by a very

10   distinguished jurist that every case is like a

11   snowflake.  They're all different.  Every Defendant

12   comes before the Court with his own set of

13   circumstances, and every case is different.

14        And I recognize you have some measure of

15   uniformity that's going to be needed, so I took some

16   time after receiving the Government's memo to do my

17   best to research all of those cases.  There's only so

18   much information you can get due to various seals and

19   different things, but I'm able to get a flavor for all

20   of them.

21        And I'm going to respectfully suggest the one

22   difference in this case as opposed to those,

23   regardless of the facts and what happened, is in this

24   case Mr. Goodman comes to the Court with the absence of

25   any criminal history whatsoever.  He's never been --

1    he's never been arrested before.

2          He also -- and what I find glaring in many of

3    those cases is the total lack of remorse and the fact

4    that folks sometimes just -- you know, they want to be

5    more concerned with themselves, their own self-interest

6    and not try to minimize their exposure to jail.

7          Mr. Goodman has not done that in this case.  In

8    a moment he's going to address the Court, and I'm going

9    to tell you now he's not a proficient public speaker.

10   He's got a lot of anxiety.  He's a very nervous fellow.

11   He had a great deal of difficulty getting through the

12   interview for the presentence investigation.  I've met

13   with him many times.  He's pretty comfortable talking

14   to me.

15         He did his best to articulate his level of

16   remorse to this Court in his letter, and it's my

17   practice just for ease of the Court to take these

18   letters that are prepared by Defendants and retype

19   them; but I didn't do that in this case.  It was

20   handwritten, he wrote it, he wrote it without my help,

21   and I submitted it in its original form.

22         We turn next, I think, to the appropriate

23   sentence.  And I understand many of the recommendations

24   and such; but as I said, both cases have their own

25   facts and circumstances and backgrounds.

1    You're aware of Mr. Goodman's background, and

2    I'm hesitant to get into it now.  He was a victim

3    himself, never sought help.  Apparently everybody knew

4    about it.  You received letters from his mother and a

5    family friend detailing that, the difficulty he had

6    growing up.

7    He never received any help whatsoever.  And to

8    his credit, he's receiving it now.  And I've included

9    that, and I expect that to continue for many years to

10   come.

11   But that's not an excuse, and I think the first

12   letter -- the first words in his letter to you is he

13   doesn't make any excuses.  He did it.  He understands

14   it.

15   I don't stand here asking you to show him any

16   measure of really -- real measure of leniency.

17   Mr. Goodman and I discussed a potential recommendation

18   or potentially not even making a recommendation to this

19   Court, and ultimately I left the decision to him.

20   He's asking for 22 years.  The minimum sentence

21   you can give him is 15, and I think on his own he

22   understands that -- he wants to send this Court a

23   message that he understands that he needs to be

24   punished.

25   I'm not asking you to let -- to show him any

1    leniency.  I'm asking you for more than two decades of

2    jail.  I'm asking you for a 50 percent increase over

3    the minimum sentence, and that's the basis upon which

4    we arrived at that number.

5         He wants you to know, not through just words, I

6    guess he could have written anything, he wants you to

7    know through an action, like, he understands.  You're

8    going to give him more than the minimum.  He deserves a

9    lengthy sentence.

10        The question you have to ask yourself, and it's

11   your decision, and I understand that and will respect

12   it, he's tried to come to you with some credibility,

13   tell you how sorry he was.

14        And respectfully, I think it's a big deal that

15   he never had anyone testify or do anything to in any

16   way defend himself of this matter.  He knew he was

17   going to jail for a long time the moment I met him, and

18   he's prepared to accept whatever sentence the Court

19   doles out now.

20        But based on his background, his true and

21   legitimate remorse over what happened, what he did, the

22   question becomes are we going to lock this man up

23   forever as the Government suggests or is there some

24   notion that he's not beyond redemption, is there some

25   notion that if he avails himself of all that he can

1    that some day, I know it's going to be a long time from

2    now even if you accept my recommendation, he can rejoin

3    society after being properly rehabilitated.  Thank you.

4              THE COURT:  Thanks, Mr. Dawson.

5              Mr. Goodman, do you want to say anything before

6    I impose sentence?

7              THE DEFENDANT:  Yes.

8              THE COURT:  Why don't you stand up, please.

9              THE DEFENDANT:  Yes.

10             THE COURT:  Go ahead.

11             THE DEFENDANT:  I'm not good at --

12             THE COURT:  That's okay.  Take your time.

13             THE DEFENDANT:  I've ben incarcerated at the

14   Donald W. Wyatt Detention Facility following my arrest

15   for my crimes for the past nine to ten months.

16             In these past months, I have had a lot of time

17   to reflect on my actions and their consequences.  I

18   have no excuse for the decisions I made and the effects

19   they caused.

20             I take full responsibility for everything I've

21   done.  I was supposed to protect my children and

22   cherish my family and my wife and my friends.  I've

23   lost everything that was most precious to me and have

24   destroyed the lives of those closest to me.

25             I truly never realized just how destructive and

1   selfish my actions were, and I'm truly sorry for the

2   pain and suffering I have caused.  I have wasted the

3   Court's time and resources.  I have left my wife,

4   Rachel, to raise our children on her own as well as

5   lost her love and trust.

6          I've lost the trust of my sons and daughters.

7   I've lost the trust of my brother, my sister, my

8   mother, countless others I was close to, and I never

9   meant to cause anyone any pain.  I never did.

10          I continuously wanted to find a way to get help.

11   I realized it was wrong, but I didn't know where I

12   could go to get help or who I could tell.  I'm now

13   receiving some care and help and have been engaged in

14   programs here at the facility.  As I move on, I will

15   continue to enroll in programs to help me battle this.

16          I can only hope that one day all those lives who

17   I have affected can forgive me.  Once again, I'm truly

18   sorry for everything I've done and all the pain and

19   anguish I caused.  I never, ever, ever meant to cause

20   anyone any pain.  I did not realize exactly how selfish

21   I was being, and I'm truly sorry.

22          THE COURT:  Thank you, Mr. Goodman.  Why don't

23   you remain standing, please.

24          THE DEFENDANT:  Sorry.

25          THE COURT:  That's okay.  Sentencing requires a

1   Court to look at the history and characteristics of the

2   person that stands before us and the nature and

3   circumstances of the offense and analyze each of those

4   and then come up with a sentence that performs a number

5   of different factors:  It punishes, it deters the

6   individual, it protects society by deterring others, it

7   provides the deterrence, it provides needed educational

8   or vocational training and rehabilitation.  And somehow

9   through all of that you have to come up with an

10  appropriate sentence.

11      Let me begin with the history and

12  characteristics of the person that stands before me.

13  It is incredibly hard to sentence a victim who went out

14  and victimized others, and there is no way that the

15  Court can analyze this case without acknowledging and

16  attempting to understand what you went through as a

17  child.

18      And at the time, I suppose it was maybe the '60s

19  or '70s or whenever it was, where you were sexually

20  molested by a trusted teacher at the school and that

21  when your parents got wind of this and reported it,

22  nothing was done, things were turned the other way, I

23  can't imagine what effect that had on you.  It must

24  have been as egregious as what we've read about today.

25      And then the other instances of abuse that

1    you -- that were brought upon you, it is clear that you

2    have been a victim of sexual abuse and sexual assault.

3    And it is clear to me from what I know that as a result

4    of your victimization, you went out and victimized.

5         It's one of those cases where the crime is so

6    horrendous that it's difficult to acknowledge that

7    potentially your culpability isn't as great as the

8    seriousness of the offense that you committed.

9         I can't imagine what it was like to have been

10   abused over those years, and I can't imagine what you

11   did; but it's clear to me that there was a cause and

12   effect.

13        So evaluating your culpability, that is, the

14   history and characteristics of you, isn't the dominant

15   factor that I look at whereas in some cases it is.  It

16   really turns the focus on the nature and seriousness of

17   the offense.

18        I've only been on the bench almost eight years.

19   Mr. Vilker talked about 20 years' history.  I can't

20   imagine anyone, maybe the law enforcement officers are

21   different, I don't know, that could imagine a more

22   egregious result.

23        You spent six years, six years abusing, sexually

24   abusing two young girls when they were six years old to

25   12 years old, the most vulnerable time of their life,

1    and the person they most trusted victimized them for

2    six years in a serious and egregious way.  It's

3    incomprehensible what effect it will have on them.

4         And then after a few years potentially, if we

5    know all the facts, you picked it up again in 2005,

6    2006, I think; and you began abusing an infant, your

7    own infant, in a sexual manner.  I really can't

8    conceive of how horrific an effect that will have on

9    those folks for the rest of their lives.

10        And so the question for the Court in determining

11   an appropriate sentence is, what's appropriate with

12   what we know today.  And the only conclusion I can come

13   to, Mr. Goodman, is that I have one obligation that

14   stands far and above everything else that I'm required

15   to consider, all of which I've considered.  Two things.

16   One is how do I protect the public from you ever doing

17   this again to anyone and how do I give assurances to

18   your victims that they'll never be abused at your hands

19   again.

20        And the only way that I can do that and I'm

21   required to do that and will do that is to ensure that

22   you never get out of prison again, that you never are

23   allowed to or able to hurt anyone again.  And it's the

24   protection of the public and it's the confidence that

25   the victims know that they will forever and ever and

1   ever be protected from your hands that motivate the

2   Court's sentence.

3         Again, it's not punishment that's motivating me

4   in this at all in light of your history and

5   characteristics.  It's protection of the public, and

6   it's to protect as best we can the victims to know and

7   forever realize that you will not get out of prison and

8   potentially hurt them again because I have no

9   assurance, none, I have no assurance that this could

10   ever -- that you will ever stop.

11         I mean, we haven't even talked about -- we

12   haven't even focused on the fact that not only,

13   Mr. Goodman, not only did you abuse your children in a

14   violent and sexual manner, but you filmed it and you

15   photographed it and you put it up on the internet for

16   others to continue to abuse your victims.

17         The level of depravity that that represents to

18   me is beyond -- absolutely beyond comprehension that I

19   cannot take a chance, I cannot take a chance that you

20   will do that to anyone again because I think you are

21   that sick, whether it's your own fault or not.

22         (Pause)

23         MR. DAWSON:  Your Honor, my client appears to be

24   unconscious.  Perhaps a brief recess is in order.

25         THE COURT:  Sure.  Marshals, do we need to

1    call --

2            MARSHAL:  We will.  We will, Judge.

3            MR. DAWSON:  May I have one moment?

4            THE COURT:  Certainly.

5            (Defendant confers with counsel)

6            MR. DAWSON:  Your Honor, my client and I have

7    had a conversation.  He does appear to be lucid, and

8    it's his desire to conclude this matter.

9            THE COURT:  He can remain seated for the

10   proceeding.  You can sit down, too, Mr. Dawson.  It

11   will make it easier.

12           The Court's going to impose a sentence as

13   follows:  As to Counts I through VIII, which are the

14   sexual exploitation of a child, the Court's going to

15   impose a period of 30 years as to each of those eight

16   counts.  Each of those counts is to run consecutively,

17   meaning one after the other.

18           The Court is going to impose a period of 20

19   years as to Count IX, which is the distribution of

20   child pornography, which is to run consecutively to --

21   all counts are to run consecutively to each other.

22   Thirty years each as to Counts I through VIII.  Twenty

23   years as to Count IX.

24           Mr. Vilker, we didn't address the issue of

25   restitution.  How many victims have asked for

1    restitution?

2              MR. VILKER:  There are six victims, your Honor.

3    They each ask for restitution.  I know it's a bit

4    academic since there's no assets, but --

5              THE COURT:  The Court's going to impose

6    restitution of $1,000 as to each of the six victims.

7    Interest is waived.  A fine isn't appropriate, but the

8    Court will impose the $900 mandatory special

9    assessment, and the Court will impose a lifetime of

10   supervised release with just the standard conditions.

11             As part of the plea agreement, the Defendant

12   waived any right to appeal the sentence that the Court

13   imposed.

14             Mr. Vilker, is there anything further for the

15   Government?

16             MR. VILKER:  No, your Honor.  Thank you.

17             THE COURT:  Ms. Picozzi, is there anything

18   further for probation?

19             THE PROBATION OFFICER:  No, your Honor.

20             THE COURT:  Mr. Dawson, is there anything

21   further for Mr. Goodman?

22             MR. DAWSON:  No, your Honor.

23             THE COURT:  Thanks, folks.  We'll stand

24   adjourned.

25             (Adjourned)

1                    C E R T I F I C A T I O N

2

3

4              I, Karen M. Wischnowsky, RPR-RMR-CRR, do

5      hereby certify that the foregoing pages are a true and

6      accurate transcription of my stenographic notes in the

7      above-entitled case.

8

9                    April 11, 2019

10                   Date

11

12

13                   /s/ Karen M. Wischnowsky_____

14                   Karen M. Wischnowsky, RPR-RMR-CRR
                     Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25